Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with minor modifications as follows:
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Order as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to governance by the North Carolina Workers' Compensation Act.
2. The employee/employer relationship existed at all times relevant herein.
3. The defendant-employer is insured with National Union Fire Insurance and adjusted through Crawford and Company at all times relevant herein.
4. Plaintiff's average weekly wage has been determined by a signed Form 22 Wage Chart which reflects plaintiff's average weekly wage as $693.20 thereby entitling plaintiff to a compensation rate of $426.00, the maximum compensation rate for 1992.
***********
Based upon the competent evidence of record herein, the Full Commission adopts with minor modifications the Findings of Fact of the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 33 years old and had an AB Degree in nursing. She began working at Charter Hospital, the defendant-employer, in 1989 and continued until 1993.
2. Before nursing school plaintiff had a problem with migraine headaches in 1985. She was seen at that time by Dr. David Grouse, a physician in West Virginia, and was given anti-depressants and betablockers. Other than that, plaintiff testified that she did not have a history of headache problems except for tension headaches.
3. On May 25, 1992, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course and scope of her employment with the defendant-employer when she was helping a patient to the phone and the patient fainted, causing plaintiff to fall and hit the back of her head. Plaintiff got up, then fainted and fell a second time, striking her forehead. Plaintiff was initially treated at the Moses Cone Memorial Hospital emergency room. Plaintiff complained of headaches, neck and lower back pain and numbness and tingling of the left hand. Plaintiff also suffered from amnesia. The parties entered into a Form 21 Agreement wherein the defendants accepted the claim as compensable and agreed to pay plaintiff $426.00 per week for the necessary weeks. The Form 21 Agreement was approved by the Industrial Commission on June 11, 1992.
4. Dr. Armah Cooper, a board-certified psychiatrist, treated plaintiff on a regular basis before and after her fall of May 25, 1992. Dr. Cooper also worked with plaintiff at the hospital and considered her to be an excellent psychiatric nurse. After her injury, Dr. Cooper took plaintiff out of work from May 25, 1992 until June 14, 1992. At that point, plaintiff was eager to return to work, and Dr. Cooper released her without any restrictions. Thereafter, over the ensuing weeks and months after returning to work, plaintiff reported a number of physical and psychological problems and sought treatment with several doctors.
5. Dr. Cooper originally began treating plaintiff in November 1991 for depression. While she was working at Charter and before her fall, plaintiff was on Prozac. She also had a history of speech impairment, blurred vision, fatigue, numbness in her hands, arms and legs which predate her injury at Charter. Also prior to her injury, plaintiff complained to Dr. Cooper about having nightmares and flashbacks due to previous sexual abuses. She had difficulty sleeping which had persisted for a number of years.
6. Plaintiff has a history of emotional difficulties. Plaintiff had an abortion in 1992, prior to her fall of May 25, 1992. This was an emotionally upsetting event for her, and after the event occurred, she had nightmares of dead babies. Plaintiff also had a miscarriage eleven years earlier for which she blamed herself because of alcohol consumption during the pregnancy. Plaintiff also testified that she had been raped in 1989 by someone she did not know, which was also emotionally upsetting and stressful.
7. In March, 1993, plaintiff became involved in a new homosexual relationship with a married woman, which continued throughout the summer of 1993. Plaintiff admitted that this was a different kind of relationship for her, and that relationship continued for some time, but was not continuing at the time of the hearing.
8. Approximately two months before plaintiff's fall, Dr. Cooper diagnosed plaintiff with post-traumatic stress disorder and chronic fatigue syndrome based on plaintiff's problems with depression from sexual abuse. At that time, plaintiff was still capable of earning wages. After the fall, Dr. Cooper again made a diagnosis of post-traumatic stress disorder and depression, but he observed that her condition had significantly changed. He related plaintiff's changed condition to her fall. Dr. Cooper acknowledged that plaintiff was having emotional problems before the fall, but that she was still functioning and capable of earning wages. It was not until after the incident of May 25, 1992, albeit one year later, that plaintiff became disabled from working. As time progressed after the fall and her return to work, plaintiff became anxious and more irritable, had trouble reading, could not keep her attention focused and could not concentrate on what she was saying. She acted confused and disoriented, was forgetful, suffered memory lapses, and behaved and talked "funny," causing her job performance to deteriorate. Everything became harder for her to do, and during this period of time plaintiff was taking anti-depressants. It was also Dr. Cooper's opinion that since plaintiff's concussion and closed head injury of May 25, 1992, plaintiff had suffered significant cognitive deficiencies that were a precipitating factor in the rapid deterioration of her condition.
9. Some of plaintiff's prior medical history includes treatment beginning January 1990 with Dr. Martin A. Hatcher, a neurologist in Greensboro. When plaintiff came to Dr. Hatcher she was complaining of intermittent numbness and weakness of her left side, and plaintiff also noted some clumsiness with her left hand and problems with her speech, and she also complained of intermittent blurring of vision and double vision, and of feeling tired and exhausted. After that visit, Dr. Hatcher ordered some tests and treated plaintiff on a few more occasions, but could not determine the etiology of her problems.
10. In March, 1992 plaintiff saw Dr. Hinkling, a neurologist. Dr. Hinkling's note indicates that plaintiff had episodes of headaches every few months that lasted for a few hours at a time. Plaintiff was also complaining about numbness in her legs and her left hand, and she was continuing to complain of difficulty getting words out. Dr. Hinkling's impression at that time was that plaintiff had an embellished examination regarding her left arm and that the asymmetries were not clinically significant.
11. Dr. Hatcher saw plaintiff again shortly after her fall of May 25, 1992. Plaintiff's main problems at that time were amnesia and "acting strange"; however, she did not have any complaints of headaches. Dr. Hatcher's diagnosis at that time was that plaintiff had a concussion with some amnesia, but that most of it should clear and should not be an ongoing problem.
12. Based on his deposition testimony, Dr. Hatcher concluded that part of plaintiff's trouble after the fall could be a conversion reaction. Dr. Hatcher stated that an individual who has a tendency to have a conversion reaction usually has some unmet need for attention. The person will encounter stress and the mind will react and cause them to have some physical complaint that gives them a legitimate reason for stopping what they are doing and resting. Dr. Hatcher also indicated that the symptoms for which he treated plaintiff in May and June, 1992 were not significantly different than they had been when he was seeing her previously. In Dr. Hatcher's opinion, plaintiff's past history of sexual abuse could pre-dispose her to a conversion reaction, and he opined that the headaches that he treated plaintiff for in April, 1993, approximately one year after the fall, were not related to the fall, but were purely migraine headaches. Dr. Hatcher never took plaintiff out of work, and he opined that there would be nothing related to the fall that would have rendered plaintiff unable to work.
13. Plaintiff was seen on three occasions in 1993 in the office of Dr. W. F. Heiney, a neuropsychologist. At this time, plaintiff presented with problems of horrible headaches, being disorientated, feeling depressed, anxious and irritable. A few psychological tests were administered, including the Minnesota Multi-phasic Personality Inventory (M.M.P.I.). The overall tests revealed no organic impairment which would account for plaintiff's complaints, but they did reveal that plaintiff was suffering from fairly severe depression and anxiety and that there were some post-traumatic aspects relating to her current situation. Dr. Heiney concluded that plaintiff was not very successful in managing her stress.
14. In relation to the post-traumatic aspects of plaintiff's condition, Dr. Heiney felt those were of an acute nature, based on more recent trauma, such as plaintiff's fall at work, as opposed to emotional disturbances plaintiff had experienced in her past. Plaintiff's focus while treating with Dr. Heiney was definitely on her fall, rather than other past incidents in her life, so much so that she didn't mention any of them. Dr. Heiney's explanation for this reaction was, "Given the history of nursing and the trauma of falling . . . while performing her duties as a nurse there may have been some exacerbation of unresolved internal emotional issues, which have been contributing to her depression."
15. When asked to explain why plaintiff's inability to work did not arise until one year after the fall, Dr. Heiney likened plaintiff's situation to that of the "proverbial Vietnam Veteran" who would do fine for a while, then have delayed post-traumatic reactions to his/her experiences. In essence, even considering plaintiff's past history of emotionally distressful events, Dr. Heiney related the condition for which he treated plaintiff in the latter part of 1993 as being connected to plaintiff's fall of May 25, 1992. Dr. Heiney did not get the impression that plaintiff was malingering or embellishing her symptoms, and he did not agree with Dr. Hatcher's opinion that plaintiff was dealing with a conversion reaction. In Dr. Heiney's assessment, based on the test results of the M.M.P.I., plaintiff's scores were well below the level suggestive of a patient suffering from a conversion reaction. He also observed that if Dr. Cooper had seen plaintiff before as well as after her fall, he would give more weight to Dr. Cooper's diagnosis and assessment of plaintiff's condition and its cause.
16. Plaintiff was referred to Dr. James Adelman, a neurologist in Greensboro, with a subspecialty in the treatment of headaches. Plaintiff first saw Dr. Adelman on May 27, 1993 with a chief complaint of headaches. Plaintiff told him that her headaches began after her fall in May, 1992, and as a result, Dr. Adelman originally diagnosed plaintiff with headaches that were caused by the May 25, 1992 fall. However, after he obtained medical records regarding plaintiff's prior history of headaches, blurred vision, and left side weakness, he felt that the accident had less of an effect on her. Dr. Adelman ultimately opined that plaintiff's depression, cognitive impairment and headaches were not related to the accident of May 25, 1992, that they were not so much neurologically as psychologically caused. However, Dr. Adelman deferred to Dr. Cooper's assessment of the causation of plaintiff's impairment and its extent. He also expressed a great deal of confidence in Dr. Heiney's opinion with respect to plaintiff's condition.
17. Since the accident, plaintiff has worked with rehabilitation professionals from Crawford and Company. The counselors would give her ads for different nursing positions; however, plaintiff did not feel she could do those jobs because she felt the patients would be in danger due to her inability to concentrate, etc. As a result, plaintiff displayed a lack of motivation at times. Even so, plaintiff still attempted to cooperate with vocational rehabilitation efforts, even though Dr. Cooper did not recommend that plaintiff participate in vocational rehabilitation. In fact, Dr. Cooper did not feel that plaintiff was capable of returning to a job in the nursing field at all.
18. As a result of plaintiff's lack of participation in vocational rehabilitation on September 1, 1995, defendants filed a Form 24 Application to stop payment of benefits. The Form 24 Application was approved by the Commission on September 22, 1995, effectively terminating plaintiff's benefits as of July 5, 1995.
19. Considering the fact that the vocational rehabilitation services offered by the defendants were geared towards returning plaintiff to work as a nurse, and plaintiff's treating physician did not recommend that plaintiff return to work in that area, plaintiff's lack of motivation and full participation with vocational rehabilitation efforts was not unjustified or unreasonable. Therefore, the Form 24 Application filed by defendants on September 1, 1995 should not have been approved.
20. Dr. Cooper treated plaintiff on a regular basis from November 1991 onward, and was most familiar with plaintiff's psychological and psychiatric difficulties. He also is board certified and qualified as an expert in psychiatry, the area in which plaintiff was having the most problems, as opposed to the neurologists who treated plaintiff. Therefore, greater weight is assigned to the medical opinions of Dr. Cooper, with respect to plaintiff's diagnosis, the cause of plaintiff's disability and incapability of earning wages. Dr. Heiney's opinions are assigned greater weight as well, in that he is a neuropsychologist and is qualified to render expert opinions on plaintiff's psychological state and the cause therefor.
21. As of the time of the hearing, plaintiff's long-term memory was fine, but her short-term memory was such that she had to write things down in order to remember them. Plaintiff has progressively become more impulsive, and she continues to experience severe headaches, some of which are completely disabling. Plaintiff also stated she has little or no initiative to get up and do anything.
22. Dr. Cooper has recommended additional neuropsychological testing and medical treatment in order to effectively treat plaintiff's condition.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Defendants have failed to rebut the presumption of plaintiff's continuing disability created by the Form 21 Agreement approved by the Industrial Commission on June 11, 1992. N.C. Gen. Stat. § 97-29.
2. Plaintiff's lack of full participation with vocational rehabilitation efforts was not unjustified; therefore, the Form 24 Application filed by defendants on September 1, 1995 was improvidently approved.
3. As a result of her compensable injury on May 25, 1992, plaintiff is entitled to reinstatement of temporary total disability compensation at the rate of $426.00 per week beginning July 5, 1995 until further Order of the Industrial Commission.
4. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury on May 25, 1992, including future medical expenses as recommended by Dr. Armah Cooper, plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
5. Upon approval of plaintiff's treating physician, defendants shall provide and plaintiff shall accept vocational rehabilitation geared towards returning plaintiff to work in gainful and suitable employment. N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For her temporary total disability compensation, defendants shall reinstate temporary total disability compensation to plaintiff at the rate of $426.00 per week, beginning July 5, 1995 and continuing until further Order of the Industrial Commission. Any accrued amount of compensation shall be paid to plaintiff in one lump sum and continuing as weekly payments shall continue thereafter, subject to an attorney's fee provided in Paragraph 3.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable injury on May 25, 1992, when bills for the same shall have been submitted to the Industrial Commission pursuant to approved Industrial Commission procedure.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: Twenty-five of the lump sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel; thereafter plaintiff's counsel shall receive every fourth check.
4. Defendants shall pay the costs.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ LAURA K. MAVRETIC COMMISSIONER